**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **THE UNITED STATES OF AMERICA** | ) | |
| **v.** | ) | **CRIMINAL NO. 06-227 (RBW)** |
| **DARNELL JACKSON, ET. AL** | ) | |
| **Defendants.** | ) | |

**<u>GOVERNMENT'S NOTICE OF INTRINSIC AND EXTRINSIC FACTS</u>**

## TABLE OF CONTENTS

I. FACTUAL HISTORY OF THE INVESTIGATION . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-

II. THE PRIOR , COTERMINOUS AND SUBSEQUENT ACTS . . . . . . . . . . . . . . . . -15-
    A.    Before and During the Period of the Conspiracy, Members of the Conspiracy
        Sometimes Purchased and Sold Other Illicit Drugs as the Need Arose, or
        Possessed Firearms Unlawfully. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-
        1.    Lawrence Bryant: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-
        2.    Bernie Hargrove: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -16-
        3.    Troy Hopkins: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-
        4.    Tony Hilt: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-
    B.    Members of the Conspiracy Continued to Sell Drugs After the Period Indicated in
        the Indictment or Fled Thereby revealing Their Guilty State of Mind. . . . . . . -17-
        1.    Troy Hopkins: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-
    C.    Some Members of the Conspiracy Previously Sold Illicit Drugs or Possessed
        Illicit Drugs for Resale, or Possesses Weapons . . . . . . . . . . . . . . . . . . . . . . . -18-
        1.    Debriefings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-
        2.    Tinesha Adams: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-
        3.    Troy Hopkins: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-
                a.    December 24, 1994 Arrest for Possession with Intent to Distribute
                     Cocaine. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-
                b.    November 9, 1996 Arrest for Possession With Intent to Distribute
                     Cocaine. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-
                c.    November 20, 1997 Possession With Intent to Distribute Cocaine
                     and PCP. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -21-
                d.    January 27, 2002 Gun Assault and 2004 Home Invasion. . . . . -22-
                e.    January 24, 2004 Interdiction, Burbank Airport . . . . . . . . . . -23-
                f.    March 14, 2004 Interdiction of PCP. . . . . . . . . . . . . . . . . . . . -25-
                g.    June 23, 2004 Cocaine Buy. . . . . . . . . . . . . . . . . . . . . . . . . . -26-
                h.    August 20, 2005 Arrest for Possession With Intent to Distribute
                     Cocaine and Possession of an Unregistered Firearm. . . . . . . -26-

III. THE EVIDENCE OF THE OTHER ACTS SHOULD BE ADMISSIBLE IN THE
            GOVERNMENT'S CASE IN CHIEF . . . . . . . . . . . . . . . . . . . . . . . -27-
    A.    Cocaine and Marajuana Trafficking and Prior PCP Trafficking Were Intrinsic
        Parts of the Conspiracy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -27-
    B.    Hopkins' Previous Use of his Father's Home to Sell Illegal Drugs and His Prior
        Sales of Cocaine Shows Intent and More and Should Be Admissible in the
        Government's Case-in-Chief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -40-
    C.    Evidence of Flight by Hopkins and Tinesha Adams is Relevant to Show Their
        State of Mind and Should be Admissible in the Government's Case-in-Chief.
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -41-

**IV.  CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -44-

## <u>GOVERNMENT'S NOTICE OF INTRINSIC AND EXTRINSIC FACTS</u>

The government hereby gives notice to this Court and the various defense counsel that it intends to admit evidence at trial that is both intrinsic and extrinsic to the case. The government will seek to admit some of this evidence in its case in chief.  As grounds for this notice, the government states as follows:

## I.  <u>FACTUAL HISTORY OF THE INVESTIGATION</u>

In late 2005, members of the Federal Bureau of Investigations' Drug Squad (hereinafter "FBI") focused an investigation on a local drug supplier of phencyclidine (hereinafter "PCP"), Darnell Anthony Jackson.   Investigators had learned through a variety of sources that Jackson and his co-conspirators were obtaining gallon quantities of PCP from an unknown source.  That PCP was then being distributed in Washington, DC, and in the Maryland suburbs.

Through their investigation, agents learned that Jackson had a source of supply in the Compton area of Los Angeles County, California and that he regularly flew to California to meet with that source.  After purchasing gallon quantities of PCP from that source, Jackson would have couriers deliver the drugs back to the Washington, DC area.  Agents began obtaining travel records from JetBlue and later Southwest Airlines and learned that members of the conspiracy often traveled to Los Angeles.  For example, Bernie Hargrove traveled to Los Angeles twice, including once in December 2005, and once before May 2006, and John Downs, III traveled once.  Troy Hopkins took numerous trips to California from 2004 through 2006.  Darnell Jackson took numerous trips to California from Dulles International Airport.  Other members of the conspiracy traveled to California as well.

In March 2006, agents instructed a cooperating defendant (hereinafter "CS-1") to

approach Jackson and request a quantity of PCP. In March 2006, Jackson and CS-1, traveled to Long Beach Airport. Once in Los Angeles, Jackson drove to the home of Tony Hilt, in Compton, California where he purchased a gallon of PCP. In Los Angeles, Jackson met with courier Dominique Washington, and purchased shampoo in large bottles. He then placed the PCP in the shampoo bottles and buried them in loosely-packed clothing in a suitcase. Ms. Washington later checked her suitcase. She then boarded a JetBlue flight at Long Beach Airport and flew to Dulles International Airport (hereinafter "Dulles") in Northern Virginia. Afterward, she took a taxi to a Suburban Maryland hotel. Bernie Hargrove picked up the PCP from Ms. Washington and brought it back to his residence on 10th Street, SE, Washington, DC. Jackson and CS-1 boarded a later flight than that of Ms. Washington. They arrived at Dulles and drove directly to Hargrove's residence. Along the way, Jackson telephoned John Downs, III from his cellular telephone to advise Downs that he had been successful at getting PCP. Using minimally veiled language, Jackson told Downs that he could get together with Downs later to engage in a PCP transaction.[1] Once at Hargrove's house, Jackson and CS-1 met with Keith Roots and Bernie Hargrove. Jackson dispatched Roots to buy up some car starter fluid, the substance used by the conspirators to dilute, or "stretch" the PCP so that they could sell a greater weight of the substance and maximize their profits. Jackson then sold 32 ounces of PCP to CS-1, whereupon CS-1 left Hargrove's apartment and met with agents of the FBI.

During the investigation agents received material from JetBlue Airlines that revealed that

---

[1]    Investigation revealed that Downs worked at Jackson's club sometimes and was present during meetings where drugs and money were exchanged between some of the government's witnesses and Jackson. Downs styled himself as a music producer and periodically sold PCP to acquire money.

Jackson, Hargrove, Roots, and Ms. Washington would periodically take flights between Dulles and Long Beach, California. In a pattern that was familiar to agents, the conspirators would rarely stay more than a day at their destination before returning home. Further Jackson continued to talk to CS-1 about the conspiracy. In these soliloquies, Jackson revealed that he had a partner named Troy (later identified as Troy Hopkins), a supplier named "T" (later identified as Tony Hilt), a helper named Dookie (later identified as Christopher Dobbins), and several couriers, including Ms. Washington. Also, he revealed the groups' practice of using car starter fluid to dilute PCP, and the group's occasional practice of adding other substances to the PCP liquid, such as crushed up MDMA ("ecstasy") pills, to hide the fact that some PCP batches were not as "good" (or potent) as others.

In May 2006, the United States obtained a court-authorized wiretap on the cellular phone of Darnell Jackson. As part of the administrative process at the United States Attorney's Office, a memorandum was delivered to Shavonne Rush, a Legal Assistant for then-Criminal Chief Steven Bunnell. Ms. Rush's job at the time was to log in any such memos. She was the person who received the memorandum in this case. On the evening after Rush received the memorandum in this case, Bernie Hargrove called CS-1 and warned him to stay away from Fats (Darnell Jackson) because the Feds (presumably the FBI) "are all over him." Agents learned that Shavonne Rush's sister was married to Bernie Hargrove's brother. Ms. Rush was later interviewed and admitted telling a person outside the U.S. Attorney's Office about the investigation. FBI agents later searched her desk and discovered Rush's cellular telephone bill which showed that she had made repeated calls to Hargrove. They also recovered photos of Hargrove from her desk.

Ms. Rush later admitted that she told Bobby Hargrove, the brother of Bernie Hargrove, to stay away from Jackson (because he was being investigated).  Following this leak of information, Hargrove, who had sold drugs within the conspiracy periodically to obtain cash, distanced himself from his co-conspirators.

The wiretap began in early May 2006 and ran for a period of 30 days.  During the course of this wiretap, agents were able to identify the other members of the conspiracy and to begin to understand their roles.  Agents determined that "Troy" was Troy Hopkins, who sometimes spoke to Jackson from the land line telephone in his parents' home on Lundy Drive in Lanham, Maryland.  Further, it became clear that the Drug Enforcement Administration (hereinafter "DEA") had an ongoing investigation into Hopkins and that they had used cooperating informants to purchase drugs from Hopkins over the prior two years as further detailed below. The DEA was familiar with Hopkins' practice of selling drugs from his father's home as well as his practice of hiding weapons and drugs in the bushes outside his father's home.

Agents learned that Troy Chavious, Hopins' nephew,  was the helper of Troy Hopkins, and that Christopher Dobbins was the helper of Jackson.  Jackson and Hopkins would often put their young assistants out on the front lines to insulate themselves from the likelihood of detection.  Eager to make fast money, Chavious and Dobbins would often make deliveries of drugs or money to sources or customers.  The two helpers would sometimes be tasked with sending money to couriers or helping in the repackaging efforts.  Hopkins especially used Chavious to make airplane trips for him since Hopkins weighed over 400 pounds at the time and found airplane travel uncomfortable.  When he sensed he might be under surveillance, Hopkins would send Chavious to investigate matters in his stead.  Likewise, Jackson often dispatched

Dobbins to meet with customers, or to pick up car starter fluid and Everfresh juice bottles to re-package the PCP for resale.   In the meantime, Hopkins and Jackson would stay in the background taking a larger portion of the proceeds and meting out lesser payments to their underlings.  In May 2006, Hopkins even accused Chavious of "stealing" from him, thereby claiming authority of the drug proceeds and a greater right to the ill-gotten gains.

Like Jackson, Hopkins also went to Hilt to get gallons of PCP from California or sent an underling in his place.  He sometimes used other people not named in the Indictment to pick up the drugs and deliver payment, including but not limited to Gregory Gee, Scott Wages, and a number of suburban Maryland women.  For the most part, Hopkins used women from California who were among the conspiracy's repertoire of couriers.

Like Jackson, Hopkins distributed downward to wholesale customers in Washington, DC, and suburban Maryland.  Hopkins and Jackson frequently pooled their resources, as calls on the wiretap suggest, and they recruited financial backing from other persons not named in the Indictment but who were also members of the conspiracy.

Agents learned that William Henry Grey, Keith Roots, John Downs, and Lawrence Bryant were among the wholesale customers of Jackson.   Bryant, Hargrove, Roots, and others routinely met Jackson for drug deals at the home of Wanda Owens, and several meetings between members of this conspiracy were videotaped at that location.  The group had several other "comfort zones" where they would meet members of the conspiracy to exchange drugs and money, including the Safari Steakhouse, also called the Safari Nightclub.

As the investigation unfolded, agents confirmed that Tinesha Adams was an *uber* courier who made more trips than any other courier, and who recruited neighborhood women and men to

carry PCP for the conspiracy.[2]  Flight records and later-discovered evidence revealed that Adams, Lanika Franklin, Dominique Washington and a host of other women functioned as the conspiracy's repertoire of couriers, although there were many others as well, including some men and some relatives of Tinesha Adams.

As further evidence of their conspiratorial relationship, Jackson enlisted Hopkins' help in cooking and pricing cocaine.  Specifically, Jackson asked Hopkins to help his recently paroled uncle, Darnell Kinard Jackson, by cooking cocaine for his uncle to sell so that he could make some fast money.

Soon agents learned of a specific shipment of drugs that they hoped they could intercept. In a telephone conversation between Hopkins and Jackson on May 21, 2007, the two men discussed buying PCP from Hilt.  They also discussed getting "the people out on the 5:40 flight," noting that it was the last flight of the day (which is the last JetBlue flight scheduled on most days).  In later calls the two men talked about getting three gallons of PCP from Hilt.

Shortly thereafter, a member of the conspiracy carried money to the supplier via JetBlue, traveling from Dulles Airport in the direction of California.  In the same time frame, Jackson talked on the telephone about going "to see" Hilt, a normal event when the conspirators were actually going to get PCP.

On the 23rd of May, 2006, Adams and Franklin, known couriers, took the "red-eye" from Long Beach to Dulles Airport arriving in the morning hours of the 24th of May, 2006. Anticipating their arrival, agents observed the women at the baggage claim area and waited until

---

[2]        After Hopkins' girlfriend was caught with drugs at LAX in 2004, Hopkins switched his methods slightly and began using more California-based couriers.

the women removed their suitcases from the carousel and began to exit the area. Agents then approached Adams and Franklin and asked for permission to search their suitcases. Both women consented. Inside their suitcases were bottles of personal care items that contained PCP. These personal care items included Tresemme brand shampoo bottles, Listerine Whitening mouthwash, Boost protein drink and nail polish remover. The FBI confiscated the PCP and let the women go.

Keeping with their established routine, the women then took a taxi to the hotel where they normally stayed when delivering PCP to the conspirators. Once at the hotel, the women were instructed by Hopkins to move to a different room to make it harder for law enforcement to reach them. Hopkins dispatched Chavious, his underling, to check on the women and to determine if the PCP had actually been seized or was stolen.

The FBI knew the hotel was often used by the conspirators and went to interview the desk staff about the women. However, agents were unaware at the time that Hopkins was so frequently at the hotel that he had become friendly with the desk staff. The desk staff later alerted Hopkins to the fact that the FBI had come to inquire about the women and Hopkins moved them at once to the apartment of a friend.

In the wake of the seizure, the chatter on the wire continued with Jackson and Hopkins discussing the implications of the seizure. In the days that followed, Hopkins took the women on a trip to South Carolina to keep watch over them until he could satisfy himself that they had not stolen his PCP. (Receipts later recovered at Hopkins' home corroborate the fact of this trip.) Eventually the couriers were permitted to leave, though they took different routes home.

Although the wire was terminated after 25 days, receipts, flight records, and cooperator testimony reveal that the conspiracy continued.

At the "take-down" on August 1, 2006, agents recovered evidence of the PCP conspiracy from the various defendants' homes.

The day of the take-down, Troy Hopkins spoke personally to Special Agent Jesus Gomez over the telephone. Gomez advised Hopkins that he had a warrant and should turn himself into authorities. Thereafter Hopkins fled the area and was not captured until May 2007. The search at Hopkins' father's house turned up a large amount of paperwork that supported the fact that Hopkins and Chavious had made several trips to California and had used the Days Inn in Lanham to house the couriers from California. In addition, agents found a hand-written note containing the chemical ingredients for PCP. In the house, agents found five firearms. In the yard, FBI agents found a digital scale, several packages of small, plastic zipper-style bags of the type used to package cocaine, guns and bottles of the type used to package wholesale quantities of PCP. In the house agents also found a money counter, and a room key from a hotel in Los Angeles not far from LAX. Many medical and personal documents linked Troy Hopkins to the house. Agents also found cans of car starter fluid in the garage area. In one of the bedrooms, agents located a receipt from a Target store in California dated July 1, 2006. The items purchased at Target included Listerine brand mouthwash, Tresseme brand shampoo, Krazy Glue, Boost protein drink, and peroxide, nearly the exact same items (down to the brand name) as were used to package the PCP that was seized in May 2006. Further, within various rooms of the house, agents located airline travel receipts for Hopkins which further showed that Hopkins traveled with other members of the conspiracy to source areas, letters from co-conspirators, a hotel receipt from South Carolina for the dates the couriers were taken there, rental car receipts linking Hopkins to other members of the conspiracy, a number of photographs depicting Hopkins with other drug

dealers in apparent social settings, and several postal package receipts.

In Lawrence Bryant's home, agents recovered letters from inmates in Federal prison, and several recent issues of F.E.D.s and a Don Diva magazine, which glamorize the drug trade. The issues in Bryant's possession featured articles on successful drug traffickers, articles purporting to explain what sorts of communications the Federal Government could acquire through wiretaps, and articles about the criminal legacies of persons of high repute in the "gansta" world. In addition, agents recovered paperwork that showed Bryant's credit information, recent home purchase, credit clearing efforts, and correspondence with bill collectors. Cooperators later explained that Bryant told them that he opted back into the drug trade to clear his bills because his legitimate work was not providing him with enough income to afford his new home and BMW.

In Bernie Hargrove's home agents found some drug packaging material, receipts for wire transfers between Hargrove and CS-1, paperwork linking Hargrove to the apartment, and photos depicting Hargrove with members of the conspiracy at apparent social gatherings. Agents also recovered materials supportive of the claims made later by cooperators that Hargrove opted into the conspiracy when his rap business was not providing him with enough income. Further agents recovered a photo of Shavonne Rush, the former U.S. Attorney's Office secretary who leaked the fact of the investigation to Hargrove before the wiretap was authorized.

After his arrest, Hargrove executed a waiver of rights form in writing and was interviewed by the FBI. Hargrove admitted to going to Los Angeles once or twice with Jackson. (Flight records reveal it was at least twice.) On these trips, Hargrove stated that he carried $5,000 cash on his person which he knew Jackson would use to buy PCP. Hargrove stated that

Jackson had come to his apartment on 10th Street, S.E. with a gallon and a half of PCP in March 2006. Jackson diluted the PCP with car starter fluid. Hargrove said that Jackson sent Roots out to get the car starter fluid, and that Jackson paid Hargrove $100 for allowing him to mix and repackage the PCP in the 10th Street apartment. Hargrove admitted to seeing Roots buy PCP from Jackson in the past more than one time. Hargrove admitted that was familiar with Lawrence Bryant stating that he thought Bryant was Jackson's cousin. Hargrove recognized Tinesha Adams from a photo, stating that she was a woman who showed him around Los Angeles and went in to purchase PCP with Jackson while the two men were in Los Angeles. Hargrove added that he had also seen Adams in Washington, DC before. Hargrove identified Dominique Washington and said that she came to Washington, DC because she and other women transported PCP from Los Angeles.

On August 3, 2006, agents also arrested John Downs, III. After executing a written waiver of rights, Downs stated that he be acquainted with Jackson at a party through their mutual interest in music production. Downs said that he started buying PCP from Jackson around June 2006, and that he bought PCP from Jackson approximately eight times. Downs indicated that he bought as little as one ounce of PCP and as much as four ounces each time. Downs admitted that he resold the PCP in the form of "dippers" (PCP dipped cigarettes) for $15 apiece. Downs claimed that he started selling PCP because he was out of work and was trying to go back to college. At the time he was arrested, Downs had Jackson's wallet and keys in his Land Rover. Downs explained this by stating that he was supposed to give these items to female who was then going to take them to Jackson.

As the investigation unfolded even further, agents learned from cooperators and other

records that Tinesha Adams recruited her brother, her cousins, her neighbors, her own mother, and anyone else who was willing to engage in high-risk drug-running for fast cash.  Once Adams knew she was wanted by law enforcement, she moved from her home to avoid being arrested. While the conspiracy was ongoing, she often partied and socialized with other members of the conspiracy here in the Washington metropolitan area, leaving her small child behind in the care of family members for days at time.  Further, Adams sometimes skimmed PCP from the conspiracy's shipments for her own use.  Indeed phone calls between Jackson and Hilt recorded during the wiretap feature Hilt complaining that Adams was high while she was at his home to conduct drug business.  In addition to the PCP she skimmed, Adams sometimes took a portion of the money owed to couriers as a commission to herself thereby casting herself as their leader and organizer.  On that score, Adams' name appeared often as the person booking the flights for the other couriers and she received payment for incidentals via wire transfers even when she was not the courier who was going to take the risk to transport the PCP across country.  In many of the records of wire transfers and airlines flights Adams used addresses she was known to frequent near Hoover Street in Los Angeles and Compton.  In other records, she used addresses associated with the Maryland-based members of the conspiracy.   After the take-down in August 2006, Adams moved apartments, protesting to other conspirators that she was not going to turn herself in until the government wanted less time, meaning a lower possible sentence.  When she learned that Hopkins too had fled, Adams' brother's mother, Sadie White, rented an apartment for Hopkins so that he could base himself in Los Angeles and carry on with his PCP business while remaining at large.  Eventually, Adams was arrested in Compton near a day care center.  Adams was with Sadie White at the time of her arrest.  At her initial appearance Adams falsely claimed

to authorities that she was pregnant in an effort to get released.   She further claimed that, despite

all the evidence that she booked flights and received money, she was the merely the victim of

identity theft.  On the contrary, the government's investigation showed that Adams was definitely

the person at the center of the effort to transport the PCP via aircraft.  Further Adams' former job

at Mona Park positioned her to meet many people in the gallon-quantity PCP trade that

flourished near the Park and was fueled by the Mona Street Crips and the 117th Street Bloods.

## II.  THE PRIOR , COTERMINOUS AND SUBSEQUENT ACTS

Through cooperators, prior police reports, interviews with agents and law enforcement,

review of  certified court documents, and other corroborating evidence, the government has

learned many facts about the conspiracy and its beginnings which should be admitted at trial.

A.    Before and During the Period of the Conspiracy, Members of the Conspiracy Sometimes
      Purchased and Sold Other Illicit Drugs as the Need Arose, or Possessed Firearms
      Unlawfully.

      1.    Lawrence Bryant:

During the period of the conspiracy, Bryant purchased both PCP and marijuana from

Jackson, and discussed the sale of a firearm with Jackson.  These sales would sometimes take

place at the home of Wanda Owens on 51st Street, SE, Washington, DC, where many drugs were

sold, including cocaine.  Bryant, who had a legitimate job, had recently purchased a new home

and a new automobile, and he told other members of the conspiracy that he was having trouble

paying his bills.  Because he had a history of selling heroin in the 1980s and 1990s, Bryant

returned to drug sales to meet his growing financial obligations.  Bryant was heard on the wiretap

discussing this with Jackson and delaying Jackson when he did not have the funds to pay him.

Bryant physically received the PCP he purchased from both Christopher Dobbins and Darnell

Jackson.  When Wanda Owens' home was searched at take-down, agents recovered a large amount of drug packaging, cutting, and weighing material and several photos depicting members of the conspiracy.   Agents learned that many of the drug deals involving Bryant took place inside Ms. Owens' home.

Prior to the period of the conspiracy, Bryant sold heroin in Washington, D.C.  He was convicted of a heroin selling offense in the early 1990s.

2.    Bernie Hargrove:

Prior to the conspiracy, Hargrove would sometimes accompany persons to meetings where cocaine deals were discussed.  Further, drug packaging material found at his home on 10th Street, SE, Washington, DC suggest that he may also have dealt in other drugs during the period of the conspiracy as well.  The persons involved in those earlier cocaine transactions were not the same as the persons involved in the PCP conspiracy.  On October 23, 2001, a cooperating witness met with Antwan Ball, a current defendant in the Congress Park case presently in trial before Judge Richard W. Roberts.  Hargrove was seated in the front passenger seat of Ball's car when the cooperating witness entered the back seat and discussed a purchase of crack cocaine from Ball.  The actual sale of the cocaine took place later when Hargrove was not around, but Hargrove was trusted to be present in the intimate confines of an automobile when the conversation was taking place.  Following this incident, Hargrove moved from one address to an address on 10th Street, S.E..

During the period of the conspiracy, Hargrove had small plastic zipper-style bags consistent with cocaine packaging in his home at the time of the search warrants on August 1, 2006.

3.    <u>Troy Hopkins</u>:

During the period of the conspiracy, Hopkins also purchased cocaine and even helped

Darnell Kinard Jackson (Darnell Jackson's uncle) cook powder cocaine into crack for resale.  At

the time of the search of Hopkins' father's home, agents recovered a digital scale and a large

number of small zipper-style plastic bags of the type used to package cocaine for resale.  Hopkins

possessed several firearms during the period of the conspiracy, which he could not legally

possessed since he had previously been convicted of several felonies.  Further, Hopkins had a

long history of selling crack cocaine, and calls reveal that Jackson sought Hopkins' "expertise" in

an effort to help his recently-paroled uncle find a way to make fast money.

4.    <u>Tony Hilt</u>:

Hilt possessed marijuana for resale during the period of the conspiracy and had several

firearms, which he could not possess lawfully due to his status as a convicted felon.  In the

apartment where his sometimes-girlfriend lived, Hilt kept two guns, and several calibers of

ammunition.

B.    <u>Members of the Conspiracy Continued to Sell Drugs After the Period Indicated in the
Indictment or Fled Thereby revealing Their Guilty State of Mind.</u>

1.    <u>Troy Hopkins</u>:

Hopkins continued to sell PCP to wholesale suppliers in suburban Maryland after July 27,

2006.  After he spoke to S.A. Gomez on the telephone and was advised he was wanted, Hopkins

moved to Atlanta, Georgia and stayed there until agents stopped a car driven by a female criminal

associate of Hopkins.  After that traffic stop, Hopkins moved to Los Angeles where he was

housed and sheltered by the family members of Tinesha Adams.  While hiding in Los Angeles,

Hopkins continued to buy PCP and ship it back to suburban Maryland.

When at last he was arrested in May 2007, in a gambling casino in Los Angeles, Hopkins told the Deputy U.S. Marshals arresting him that he would give them $500,000 cash if they would just let him go.  Further, he promised he could lead them to the biggest PCP cooker in California thereby confirming the fact that remained an active PCP trafficker through his arrest.  As he was being led out of the casino by Deputy U.S. Marshals, the entire gaming floor erupted in spontaneous applause.

Cooperating witnesses both in and out of custody with testify that Hopkins continued to sell PCP during the entire period of his flight.  The government's evidence at trial will include evidence that Hopkins, Jackson, and others continued to sell PCP even after the wiretap was ended.

2.    <u>Tinesha Adams</u>:

Adams and her family provided support for Hopkins while he was a fugitive and otherwise enabled his continued drug sales.  Sadie White, a relative of Adams, rented apartments for Hopkins in her own name while Hopkins was on the run.  White was with Adams when she was arrested after being a fugitive for many months.

C.    <u>Some Members of the Conspiracy Previously Sold Illicit Drugs or Possessed Illicit Drugs for Resale, or Possesses Weapons</u>.

1.    <u>Debriefings</u>.

Certain of the defendants, who seek to have their cases tried before this Court, participated in debriefings with members of law enforcement pursuant to a standard debriefing letter.  In those off-the-record debriefings, certain of the defendants admitted to prior PCP and/or cocaine sales that pre-dated their time in the conspiracy.  At the time of trial, the government will

seek to introduce these prior instances within the limits of the debriefing agreements made between the parties.  The government hereby provides notice that it will seek to admit any such prior PCP selling activities should the defendants testify or raise a defense inconsistent with any proffered information.  Further, some of these same individuals admitted to FBI agents at the time of their arrest that they had participated in the conspiracy.

        2.      Tinesha Adams:

_____Adams was previously arrested with cocaine in an amount sufficient for resale demonstrating her familiarity with drug possession for resale.  At the time of her arrest she admitted the cocaine was not for her personal use.  Adams' case was ultimately dismissed but only after she entered drug diversion and bench warrants had to be issued for her arrest.  On January 21, 2002, Adams was stopped by police officers near Figueroa and 42nd Streets in Los Angeles.  Adams had four rocks of crack cocaine on her person and a bag containing cocaine residue.  After being read her rights, Adams stated that she did not smoke cocaine and claimed to have found the drugs in a grocery store parking lot.  In response to routine booking questions, Adams told officers that she resided at 2448 126th Street, Apartment 125, Los Angeles, California.  Both the area of 42nd Street near Hoover Avenue, and the area of 126th Street will be part of the government's case in the instant conspiracy since Adams used an address near 42nd Street when she received money orders from other members of the conspiracy and booked flights, and she did drug business with Hilt on 124th Street in Compton, California.

3.    Troy Hopkins:

a.    December 24, 1994 Arrest for Possession with Intent to Distribute Cocaine.

On December 24, 1994, Troy Hopkins was arrested by Prince George's County Police. The arrest took place after a car stop in which officers recovered two rocks of crack cocaine. During a search at the station, officers located more than 60 rocks of cocaine on Hopkins' person.  At the time of the stop and arrest, Hopkins gave his address as 5601 Lundy Drive in Lanham, Maryland.  Hopkins pleaded guilty to this offense in November 1995.[3]  During the instant conspiracy, Hopkins often met members of the conspiracy at the home in Lundy Drive for drug transactions.  Further he kept drug packaging materials, weapons, the written formula for PCP, cocaine packaging material, and other drug selling accouterment at the Lundy Drive home, just as he did in the past.

b.    November 9, 1996 Arrest for Possession With Intent to Distribute Cocaine.

On November 9, 1996, responding to a call about an assault in a high drug trafficking area, police approached a group of young men sitting outside 7440 Landover Road in Landover, Maryland.  Troy Hopkins was among these young men.  Officers discovered that Hopkins, then a convicted felon, had a 9 mm pistol, a bag containing 32 grams of crack and over $1,600 in U.S. currency.  At the time of his arrest, the defendant told police his name was Brian Raines.  Later, police approached Alfred Hopkins, Troy Hopkins' father, and asked his permission to search Troy Hopkins' car.  Alfred Hopkins consented to this search and further advised police that Troy Hopkins was the only person who used the car.  Officers opened the door and searched a hidden

---

[3]    On November 3, 1996, the defendant was arrested in Landover, Maryland after he was found trespassing in an abandoned apartment throwing dice.

compartment in the door panel where they found 32.1 grams of crack cocaine, razor blades, numerous small plastic bags with zipper locks and two identification cards for Hopkins.  On August 11, 1998, Hopkins pleaded guilty to this offense.[4]

     c.     <u>November 20, 1997 Possession With Intent to Distribute Cocaine and PCP</u>.

On November 20, 1997, Hopkins was arrested and charged in a 15-count indictment in Prince George's County, Maryland with a variety of drug crimes, among them possession with intent to distribute PCP, cocaine and heroin, and possession of a handgun during a drug trafficking offense.  The defendant was the target of a narcotics investigation in Maryland wherein detectives targeted a possible stash house used by Hopkins near Sheriff Road.  Acting on information developed in that case, including several trash recoveries that turned up repeated evidence that cocaine was being packaged in the residence, officers obtained a search warrant for the residence which was associated with Hopkins.  On the date the search warrant was executed, Hopkins was seen driving from the search location in a BMW registered to his father, Alfred Hopkins.  Inside the search location officers located 122 grams of crack cocaine, 125 grams of powder cocaine, 227.7 grams of marijuana, 35 grams of PCP, 1.4 grams of heroin, over $1,500 in U.S. currency, an electronic scale, small zipper-style plastic bags, a shotgun, and other items. The defendant pleaded guilty to this case as well.

In the instant case there will be evidence that Hopkins and other members of the conspiracy used stash locations in the area of Sheriff Road and sold cocaine as they clearly did in the previous case.

---

    [4]     On April 30, 1997, the defendant was given a citation after officer located marijuana in a vehicle he was driving, and packaging material in the trunk.

     d.     <u>January 27, 2002 Gun Assault and 2004 Home Invasion</u>.

On January 27, 2002, Hopkins went to his neighbor's house with a loaded .38 caliber Smith and Wesson pistol and pointed the gun at his neighbor. The neighbor wrestled the gun away from Hopkins and called the police. While being transported to the station, Hopkins spontaneously complained that he was tired of people stealing from his father. At the time of his arrest Hopkins gave his home address as 5601 Lundy Drive in Lanham, Maryland.

In 2004, the elder Mr. Hopkins was the victim of a home invasion robbery. Mr. Alfred Hopkins told the police that the robbers were masked and that they took over $10,000 cash. He stated he could not identify them. In the summer of 2006, however, Mr. Alfred Hopkins espied SA Tim Ervin in traffic and confronted Ervin. By way of explaining his hyper-cautiousness, and in contradiction of his original statements to police, Mr. Alfred Hopkins told Agent Ervin that, at some time in the past, he had been the victim of a home invasion robbery and that he knew the people who committed the robbery were former acquaintances of his son. Of late, the elder Mr. Hopkins has claimed in various filings that he did not trust banks and kept the $14,000 cash in his house for safekeeping despite the fact that his home was invaded earlier and he was assaulted with a firearm in a robbery.

It will be the government's proof at trial that Troy Hopkins kept money, drugs and firearms in his parents home and with their knowledge. Indeed Alfred Hopkins was sitting atop $14,000 in U.S. currency when his home was searched on August 1, 2006. This tendency of Troy Hopkins to store drugs and money in his father's house was known to other drug dealers and criminals in Prince George's County. Further, this practice brought danger to Alfred Hopkins' and resulted in his house being invaded to steal drug proceeds. Despite being

assaulted, Alfred Hopkins continued to store cash in his house and to allow his son to sell drugs from the house and the yard.

After the assault on his father, Troy Hopkins would sometimes call upon neighbors, assembling a posse of sorts, to take up defense of his father's home and his drug proceeds rather than simply leaving drug selling behind. Moreover, Hopkins installed an exterior camera on the house so he could see would-be callers at the front door. Hopkins and Troy Chavious began storing certain of their criminal implements, such as guns and drug containers, outside the house in the yard and nearby bushes, and Hopkins also used other stash locations, including a condo and an apartment off of Sheriff Road.

e.    January 24, 2004 Interdiction, Burbank Airport

In the morning of January 24, 2004, Hopkins and the mother of Hopkins' child, Marquita (Kim) Booth, were stopped in Burbank, California Airport.[5]  Although Hopkins had no PCP on his person, his luggage had a strong odor of PCP solvents.  Hopkins had been traveling with Booth and a man named Russell Stringfield.  At the security checkpoint for departing passengers, Booth and Stringfield's luggage were searched.  In the luggage, agents found one and a half gallons of PCP contained in Infusium brand shampoo bottles, and Listerine brand mouthwash bottles.  Hopkins was eventually let go because he did not have the PCP on his person.

Later that same morning, acting on further information linking Hopkins to hotel guests in the Los Angeles area, agents went to a room at the Motel 6 on Century Boulevard in Inglewood,

---

[5]    Burbank is a town in the San Fernando Valley.  It is within Los Angeles County. Southwest Airlines serves Burbank Airport.  Southwest Airlines provides service to Thurgood Marshall Baltimore Washington Airport in Baltimore, Maryland.

California.[6]  The manager knocked on the door of a room occupied by Kevin Barnett and two

other men from Suburban, Maryland.   Before the door was opened, agents could smell the strong

chemical odor that is associated with PCP.  Through the drapes, agents could see the men

running frantically back and forth to the bathroom.  Eventually agents gained entry and found

many Infusium brand shampoo bottles in the bathroom.  PCP liquid had been spilled across the

floor at the base of the toilet in what was an obvious attempt to destroy it.  A towel soaked with

PCP liquid was also found in the bathroom, the remnants of a failed attempt to clean up the

spilled PCP.

Agents learned that one of the occupants of the Motel 6 room had stayed at the

Renaissance Hotel nearer to LAX the night before the seizure at Burbank Airport.  They went to

that room to look for any further evidence of PCP.  In the closet, in a black bag, agents located a

gallon of remaining PCP.

In telephone calls to an incarcerated relative, Brooks (Seldon Brooks Shelton), Hopkins

discussed this seizure.  Further, he told Brooks that he would be changing his name and that he

would let Brooks know what name he would be using in the future so that he could remain on

Brooks' authorized visitors list.[7]

---

[6]     Inglewood, California is a town within the County of Los Angles.  It is a short driving distance from Los Angeles International Airport, known as LAX.  Paperwork found at Troy Hopkins' house on August 1, 2006 was from the Motel 6 in Inglewood near the LAX.

[7]     Hopkins also advised that he would go get new identification on Alvarado (meaning Alvarado Street in Los Angeles), a place where fake identification cards are often sold to illegal immigrants.  In the Bureau of Prisons, inmates cannot receive unauthorized visitors.  Therefore if Hopkins changed his name, his relative would have to have changed the name on his authorized visitation list.  All calls in prison are recorded by the Inmate Phone System.  All inmates are advised in writing and in pre-call recordings that such calls are recorded.

In the instant case, Hopkins often used males to transport money and to repackage PCP in Los Angeles. Afterwards, they put the PCP in shampoo bottles (often cheap large bottles such as those used by the companies that manufacture Infusium and Tresemme brands of shampoo) and Listerine brand mouthwash bottles. Hopkins and the conspirators would then give these bottles to couriers, usually females, who would place in their check-in luggage. Indeed when Tinesha Adams and Lanika Franklin were stopped at Dulles Airport on May 23, 2006, the PCP they were carrying was in Tresemme brand shampoo and Listerine brand mouthwash bottles.

At trial, the government's witnesses will testify about how Hopkins told other members of the conspiracy he was grateful that his child's mother "did time" for him and how he admitted he was the person who had purchased the PCP back in 2004.

     f.    <u>March 14, 2004 Interdiction of PCP</u>.

On March 14, 2004, Federal Express Employees at the facility in Crofton, Maryland called the DEA after they located a suspicious package destined for suburban Maryland. The package was sent from Los Angeles, a known source city for PCP. The package was opened and found to contain PCP. A controlled delivery of the package was later made and the police arrested the addressee of the package. The addressee informed police that he received the package on behalf of Troy Hopkins and that he was supposed to deliver it to Hopkins. At the urging of police, the addressee made a controlled call to Hopkins. In the call, the addressee and Hopkins agreed to meet at a Papa John's Pizza in Maryland. Officers waited at the Papa John's and observed Troy Hopkins arrive at the parking lot. Hopkins appeared to see the officers after he entered the Papa John's and he turned to leave. Approximately two weeks later, the addressee was beaten at the Safari Steak House, where members of the current conspiracy often met to

exchange PCP and money.

       g.      <u>June 23, 2004 Cocaine Buy.</u>

Using a cooperating source (CS), the Drug Enforcement Administration made a

controlled buy of cocaine from Hopkins.  Hopkins told the CS that he had a "half a chicken" left,

meaning a half a kilo of cocaine.  The CS told Hopkins that the CS would like to buy 31 grams of

crack the following day.  In a recorded call, the CS telephoned Hopkins' cell phone and placed an

order for the drugs.  Hopkins then directed the CS to meet him at his parents' home at 5601

Lundy Drive in Lanham, Maryland.  Hopkins' father, Alfred Hopkins, opened the front door for

the CS and Troy Hopkins directed the CS to the garage where he sold 31 grams of crack cocaine

to the CS.

This is the same home on Lundy Drive where Troy Hopkins talked to Darnell Jackson

during the PCP conspiracy, and it is the same home that agents searched on August 1, 2007

finding weapons, starter fluid, PCP, cocaine packaging material, paperwork, the written

ingredients for PCP, and cash.  Further, at the time of the controlled buy and the time of the 2006

search, Alfred Hopkins was living at the location and acquiesced in his son's conduct by sitting

atop the cash and allowing his home to be used for Troy Hopkins' drug conspiracy and be

referring would-be customers to Troy Hopkins.

       h.      <u>August 20, 2005 Arrest for Possession With Intent to Distribute Cocaine and<br>Possession of an Unregistered Firearm.</u>

On August 20, 2005, Hopkins and two other men were arrested in a car registered to

Hopkins.  In the passenger seat map pocket officers located plastic bags containing over 60 rocks

of cocaine base and over $2,000 in U.S. currency.  On the floorboard, officers recovered a loaded

pistol.[8]  The government's evidence at trial will reveal that these items were Hopkins' and that

his criminal associate took the blame, in exchange for which, Hopkins continued to supply him

with drugs.  After this arrest, Hopkins' talked to members of the instant conspiracy about the

loyalty of his friend for taking the blame.

### III.  THE EVIDENCE OF THE OTHER ACTS SHOULD BE ADMISSIBLE IN THE GOVERNMENT'S CASE IN CHIEF

The Government respectfully seeks the admission of the group's other acts because they

were inextricably intertwined with the charged offense or because they are so similar to the

instant offense as to define the method of operation of the groups, or they clearly demonstrate the

intent of the conspirators.

A.    Cocaine and Marajuana Trafficking and Prior PCP Trafficking Were Intrinsic Parts of the Conspiracy

"Rule 404(b)[9] excludes only evidence 'extrinsic' or 'extraneous' to the crimes charged,

not evidence that is 'intrinsic' or 'inextricably intertwined.'" United States v. Allen, 960 F.2d

1055, 1058 (D.C. Cir.), cert. denied, 506 U.S. 881 (1992).  "[The evidence] was an intrinsic part

of the witness' account of the circumstances surrounding the offense for which [defendant] was

---

[8]         The pistol had been stolen from Prince George's County Maryland where Hopkins lived.

[9]         Rule 404(b) of the Federal Rules of Evidence provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

indicted (and also was relevant both to [defendant's] intent to distribute and his knowledge about [a co-conspirator's] drug cache." Id. at 1057; see also United States v. Gartmon, 146 F.3d 1015, 1020 (D.C. Cir. 1998) (evidence that defendant charged with fraud had threatened a coconspirator not "other crimes evidence" but instead "inextricably intertwined" with charged offense); United States v. Garces, 133 F.3d 70, 77 (D.C. Cir. 1998) (holding that evidence that "was part of the story" was not other crimes evidence); United States v. Washington, 12 F.3d 1128, 1134-35 (D.C. Cir. 1994), cert. denied 513 U.S. 828 (1994) ("Moreover, 'Rule 404(b) excludes only evidence 'extrinsic' or 'extraneous' to the crimes charged, not evidence that is 'intrinsic' or 'inextricably intertwined.' The testimony revealing that Early used his cousin's Kaiser Permanente health insurance card to obtain medical treatment was intrinsic to the charged offense because it helped establish his identity as the driver of the Mazda . . ."); Fed. R. Evid. 404(b), Advisory Comm. Note regarding 1991 Amendment ("The amendment does not extend to evidence of acts which are 'intrinsic' to the charged offense [citation omitted].").

United States v. Badru, 97 F.3d 1471 (D.C. Cir. 1996), cert. denied 520 U.S. 1213 (1997) , is particularly instructive on this point. In Badru, defendants were charged with conspiracy to distribute and possess with the intent to distribute heroin and actual counts of distribution. Id. at 1473. At trial, the government introduced evidence that the defendants had previously been involved in smuggling heroin into the United States. Id. The Court of Appeals held that the evidence was not "other crimes" within the purview of Fed. R. Evid. 404(b); instead, it had been properly admitted as "intrinsic" other crimes evidence:

> Given the similar modus operandi between the couriers' pervious
> trips to Nigeria and the planning and execution of the trip that
> ended in April 1993 with the seizure of 5,569 grams of heroin from
> the couriers' luggage, a jury reasonably could find that appellants

> conducted the previous trips for the same purpose as the trip that
> ended in April 1993.

Id. at 1475.

Hopkins prior involvement in PCP trafficking in Los Angeles, and his use of shampoo bottles and female couriers should be admissible in the instant case as modus operendi evidence. The methods were nearly identical, down to the Listerine and shampoo bottles that were used to package the PCP in check-in luggage.   Even if this evidence is deemed extrinsic, it should nevertheless be admissible to show the methods and intent of Hopkins.  Further Hopkins repeated use of his father's home as stash and selling location demonstrate his dominion over the items seized in his house, his intent to possess the firearms contained in the house and his intent to keep money in the house.

The cocaine sales, and gun possessions, which were coextensive with the charged offenses, is even more inextricably intertwined with the charged conspiracy.  The sales of cocaine were less frequent that the PCP sale but they were intended to help members of the conspiracy or their family members when the need arose.  "[U]ncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitated the commission of the charged crime," thus taking such acts outside the scope of Rule 404(b). United States v. Bowie, 232 F.3d 923, 929 (D.C. Cir. 2000).[10]  This well-established principle

---

[10]     It should be noted that Bowie, 232 F.3d 923, seems to have questioned the admission of intrinsic other crimes evidence without a 404(b) analysis, but one panel of the Circuit cannot overrule standing precedent.  See, e.g., United States v. Torres, 115 F.3d 1033, 1036 (D.C. Cir. 1997) ("panels of this court [] are obligated to follow controlling circuit precedent until either [the Court of Appeals] sitting en banc, or the Supreme Court, overrule it.").  In any event, the Bowie court recognized that its position does not affect the admissibility of the evidence: the "only consequences of labeling evidence 'intrinsic' are to relieve the prosecution of rule 404(b)'s notice requirement and the court of its obligation to give an appropriate limiting instruction upon the

applies with particular force in cases such as this that involve a conspiracy. "When the indictment contains a conspiracy charge, uncharged acts may be admissible as direct evidence of the conspiracy itself." United States v. Thai, 29 F.3d 785, 812 (2nd Cir.), cert. denied *sub nom* Minh Do, 513 U.S. 993 (1994).

Moreover, where evidence of the defendants' acts are either inextricably intertwined with the charged conspiracy, or provide evidence of the conspiracy itself, it is admissible without Rule 404(b) analysis, even if those acts fall outside the period during which the indictment alleges the conspiracy existed. United States v. Diaz, 878 F.2d at 614-16 & n.2 (crimes, wrongs or acts occurring before alleged inception date of conspiracy were relevant and admissible in drug conspiracy prosecution and did not raise Rule 404(b) question); United States v. Bates, 600 F. 2d 505, 509 (5th Cir. 1979) (testimony concerning acts and backgrounds of co-conspirators, including evidence of behavior antedating period covered by indictment, was not extraneous evidence of other crimes, but admissible as bearing on the existence and purpose of the conspiracy and the significance of later behavior); United States v. Bermudez, 526 F.2d 89, 95 (2nd Cir.), cert. denied, 425 U.S. 970 (1976) (upholding admission of traces of narcotics and narcotics-related equipment seized in home six weeks after conspiracy to distribute ended). Here cocaine and occasional marijuana activities overlapped the time period of the charged PCP conspiracy, some even taking place during the period of time that the wiretap was running; thus, they are even more inextricably intertwined, rendering them admissible. They involved the same

---

defense counsel's request." Id. at 927. Here the government is providing notice, and the defendants will be free to request a limiting instruction.

members of the charged conspiracy, and reflect a long-term knowledge of one-another's criminal abilities, as in when Jackson solicited help from Hopkins to cook some cocaine into crack. Further the possession of firearms during the conspiracy is direct evidence of the existence of the conspiracy.

The Court of Appeals has defined intrinsic other crimes by quoting the Eleventh Circuit:

> "Evidence of criminal activity other than the charged offense is not considered extrinsic if it is an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, if it was inextricably intertwined with the evidence regarding the charged offense, or it is necessary to complete the story of the crime of trial . . ."

Badru, 97 F.3d at 1474. The Fourth Circuit has similarly defined intrinsic other crimes as "evidence of crimes that arose out of the same series of transactions as the charged offense or that are necessary to complete the story of the charged crime." United States v. Chin, 83 F.3d 83, 88 ( 4th Cir. 1996) (citing United States v. Kennedy, 32 F.3d 876 (4th Cir. 1994)), cert. denied, 513 U.S. 1128 (1997).

United States v. Maceo, 947 F.2d 1191 (5th Cir. 1991), cert. denied sub mon Bauman, 503 U.S. 949 (1992), is instructive on this point. In Maceo, an attorney, Hiriam Lee Bauman, and others were convicted of a narcotics conspiracy. Id. at 1193. The Fifth Circuit held that evidence of Bauman's receipt of cocaine as payment for legal services and personal use of cocaine was properly admitted as intrinsic evidence of the charged conspiracy:

> Evidence of an uncharged offense arising out of the same transactions as the offenses charged in the indictment is not extrinsic evidence within the meaning of Rule 404(b), and is therefore not barred by the rule. [citation omitted] Evidence of Bauman's personal use of cocaine and his receipt of cocaine as legal fees was not extrinsic evidence; it was "inextricably intertwined with the evidence used to prove the crime charged ,

-31-

> [and] is admissible so that the jury may evaluate all of the
> circumstances under which the defendant acted." [citation omitted]
> The evidence that Bauman personally used cocaine with others
> involved in this drug trafficking ring and that he received cocaine
> as legal fees is clearly intertwined with the evidence necessary to
> prove he knew about the drug trafficking conspiracy and
> knowingly participated in it.

Id. at 1199.

The cocaine and PCP sales are intrinsic: they "arose out of the same transaction or series

of transactions as the charged offense" Badru, 97 F.3d at 1474, and they are "necessary to

complete the story of the crime of trial." Id.

First, the PCP sales arose out of the what was originally a cocaine conspiracy and vice

versa. The same essential conspirators (Hopkins and Jackson) were involved in the cocaine

sales.

Even if the Court disagrees with the above, the conspirators' sales of other illegal drugs

should be admitted pursuant to Fed. R. Evid. 404(b). "Rule 404(b) is a rule of inclusion rather

than exclusion," "'prohibiting the admission of other crimes evidence in but one circumstance –

for the purpose of proving that a person's actions conformed to his character.'" Bowie, 232 F.3d

at 929 (quoting United States v. Crowder, 141 F.3d 1202, 1206 (D.C. Cir. 1998) (en banc)

(internal quotations omitted), cert. denied 525 U.S. 1149 (1999); United States v. Moore, 732

F.2d 983, 987 (D.C. Cir. 1984) ("[o]nly one series of evidential hypotheses is forbidden in

criminal cases by Rule 404:  a man who commits a crime probably has a defect in character; a

man with such a defect of character is more likely than men generally to have committed the act

in question.").

As our Court stated in <u>Bowie</u>:

> A proper analysis under Rule 404(b) begins with the question of relevance: is the other crime or act relevant and, if so, relevant to something other than the defendant's character or propensity?  If yes, the evidence is admissible unless excluded under other rules of evidence such as Rule 403.

<u>Bowie</u>, 232 F.3d at 930.

Evidence may be excluded by Rule 403 only "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . ."  The cocaine and marijuana sales should not be excluded pursuant to Fed. R. Evid. 403.  Rule 403's definition of prejudicial evidence does not include incriminating evidence that simply prejudices defendant's chances of acquittal:

> "Of course," as the Fifth Circuit has remarked, "'unfair prejudice' as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party.  Virtually all evidence is prejudicial or it isn't material.  The prejudice must be 'unfair.'"  The Committee's Note explains that "unfair prejudice" means an "undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one."  Evidence that appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or triggers other mainsprings of human action may cause a jury to base its decision on something other than the established propositions in the case.

1 Weinstein and Berger, <u>Weinstein's Evidence</u>,¶403[03], at 403-33 to 40 (1996) (citations omitted); <u>see</u> <u>also</u>, <u>United States v. Noland</u>, 960 F.2d 1384, 1387 (8th Cir. 1992) ("In fact, no verdict could be obtained without prejudicial evidence.").

The Court of Appeals has explained Rule 403's prohibition of unfairly prejudicial evidence in this way:

> Rule 403 does not provide a shield for defendants who engage in outrageous acts, permitting only the crimes of Caspar Milquetoasts

> to be described fully to a jury. It does not generally require the
> government to sanitize its case, to deflate its witnesses' testimony,
> or to tell its story in a monotone. It does not bar powerful, or even
> "prejudicial" evidence. Instead, the Rule focuses on the "danger of
> unfair prejudice," and gives the court discretion to exclude
> evidence only if that danger "substantially outweigh[s]" the
> evidence's probative value. [citation omitted, alterations in
> original].

Gartmon, 146 F.3d at 1020 (affirming admission of evidence that the defendant, charged with

fraud, had placed gun in wavering coconspirator's vagina and threatened her).

Further "Rule 403 'tilts, as do the rules as a whole, toward the admission of evidence in

close cases.' . . . and 'in determining whether the probative value is **substantially** outweighed by

the danger of unfair prejudice it is a sound rule that the balance should be struck in favor of

admission when the evidence [as is certainly true here] indicates a close relationship to the event

charged.'" United States v. Clarke, 24 F.3d 257, 265-66 (D.C. Cir. 1994) (quotations and

citations omitted) (emphasis in original). The evidence of sales of the other illegal drugs by the

conspirators present no danger of unfair prejudice since the same thing for which they are

charged. It does not, for example, inject something new and prejudicial, such as violence or

perversion, into the case, which might inflame the jury,[11] the exception being the beating of

addressee in which Hopkins' was clearly an instigator.

Even if the Court were to conclude the evidence presented some "unfair prejudice," that

prejudice does not "substantially outweigh" this evidence's great probative value. The balancing

between probative and unfairly prejudicial should lean toward inclusion. See, e.g., United States

---

[11]      The fact that the drugs the group sold were not identical is not important.
"Similar acts proved to show intent, scheme, plan etc., do not have to be identical to the acts
charged[]" to be admissible. United States v. Crockett, 514 F.2d 64, 73 (5th Cir. 1975) (internal
citations omitted).

v. Naranjo, 710 F.2d 1465, 1469 (10th Cir. 1983) ("Unless trials are to be conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing."); United States v. Morris, 79 F.3d 409, 412 (5th Cir. 1996) ("Because Rule 403 requires the exclusion of relevant evidence, it is an extraordinary measure that should be used sparingly."); United States v. Bradley, 145 F.3d 889, 893 (7th Cir. 1998) (Rule 403 is not a tool designed "to permit the Court to 'even out' the weight of the evidence, to mitigate a crime, or to make a contest where there is little or none.").

As the Court of Appeals stated in United States v. Mathis, 216 F.3d 18 (D.C. Cir. 2000), cert. denied 531 U.S. 1099 (2001), "[i]n a conspiracy prosecution, the government is usually allowed considerable leeway in offering evidence of other offenses 'to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationships between the participants in the crime developed.'" Id. at 26 (quoting United States v. Williams, 205 F.3d 23, 33-34 (2nd Cir. 2000) cert. denied 540 U.S. 912 (2003)).

Other crimes evidence should be admitted if the following three criteria are met:

> 1) the evidence of other crimes or acts is relevant in that is has "**any tendency** to make the existence of **any fact** that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," Fed. R. Evid. 401; 2) the fact of consequence to which the evidence is directed relates to a matter in issue other than the defendant's character or propensity to commit crime; and 3) the evidence is sufficient to support a jury finding that the defendant committed the other crime or act [citations omitted].

Bowie, 232 F.3d at 930 (emphasis added). Here, the sales of cocaine and marijuana by the members of the conspiracy should be admitted because they tend to make a fact of consequence

more probable and they relate to matters other than defendants' characters.  Specifically, as

discussed in more detail below, the cocaine and marijuana sales are admissible for the following

reasons: (1) they help to understand the defendants' coded conversations regarding the charged

offenses by putting their lingo in context; (2) they go to prove defendants' identities by virtue of

their earlier sales of drugs in the same context and with the same people; (3) they eliminate any

chance of mistake or accident by putting defendants' activities in context; (4) they demonstrate

defendants' knowledge of cocaine and marijuana, and illegal drug trafficking generally; (5) they

demonstrate defendants' intentional involvement with the charged offenses; and (6) they – as

inextricably intertwined with the charged offenses – demonstrate the defendants' preparation and

plans regarding the charged offenses.  Last, evidence of defendants's cocaine and marijuana

trafficking would also be direct evidence of the existence and structure of the charged conspiracy.

Thai, 29 F.3d at 812 (co-conspirator testimony relating to uncharged assault not 404(b) evidence

because it showed defendant's leadership role in RICO enterprise).

      As the Court of Appeals stated in its en banc decision in Crowder:

> Rule 404(b) evidence will often have multiple utility, showing at
> once intent, knowledge, motive, preparation, and the like.  Proof of
> an individual's intent to commit an act may itself serve as proof
> that the individual committed the act, as the Supreme Court
> recognized more than a century ago.  In proving that a defendant
> intended to distribute crack cocaine, for instance, the government
> might simultaneously be showing the defendant's motive to possess
> the crack, which Rule 404(b) permits.  Intent would thereby serve
> as an intermediate fact from which the jury could infer another
> intermediate fact – motive –  from which it could in turn infer the
> element of possession.  Thus, other-offense evidence of intent
> would have probative value not just on the intent element, but also
> on the possession element of the offense.

Crowder, 141 F.3d at 1208 (citation omitted).  Thus, in Crowder, other crimes evidence was

admitted to show the defendant's knowledge, intent, and motive. The Court in <u>Crowder</u> further

stated:

> A defendant's hands-on experience in the drug trade cannot alone
> prove that he possessed drugs on any given occasion. But it can
> show that he knew how to get drugs, what they looked like, where
> to sell them and so forth. Evidence of a defendant's experience in
> dealing drugs – evidence that is, of his "bad acts" – thus may be a
> "brick" in the "wall" of evidence needed to prove possession. <u>See</u>
> Fed.R.Evid. 401, advisory committee notes.

<u>Id.</u> at 1209 n. 5.

As in <u>Crowder</u>, the defendants Hopkins, and Bryant's "hands-on experience in the drug

trade [as evidenced by their history of working together in the heroin and cocaine trafficking] . . .

can show that he knew how to get drugs, what they looked like, where to sell them and so forth."

141 F.3d at 1209 n.5. Indeed, here, the other crimes evidence shows that the defendants had

contemporaneous "hands-on experience" with narcotics. This evidence is all relevant, as in

<u>Crowder</u>, "as proof that the individual committed the act" of conspiring to distribute cocaine, 141

F.3d at 1208, and, as in <u>United States v. Latney</u>, 108 F.3d 1446, 1448 (D.C. Cir. 1997), <u>cert.</u>

<u>denied</u> 522 U.S. 9401 (1997), to show defendant's criminal intent in the instant offense, "a state

of mind inconsistent with accident or inadvertence." <u>See also</u> <u>United States v. Clarke</u>, 24 F.3d

257, 264 (D.C. Cir. 1994) (evidence of prior sales of cocaine by defendants admissible to

establish intent regarding their possession of large amounts of cocaine on dates charged in the

indictment); <u>United States v. Washington</u>, 969 F.2d 1073, 1080-81 (D.C. Cir. 1992) (when

defendant charged with distribution and possession with intent to distribute drugs, 404(b)

evidence of his prior drug transactions was admissible to demonstrate intent, knowledge, plan

and absence of mistake), <u>cert. denied</u>, 507 U.S. 922 (1993); <u>United States v. Harrison</u>, 679 F.2d

942, 948 (D.C. Cir. 1982) (evidence of defendant's prior drug trafficking admissible in trial of

charges of possession with intent to distribute drugs to show intent, preparation, plan and

knowledge); United States v. (Michael) Johnson, 40 F.3d 436, 441 n.3 (D.C. Cir. 1994) (proper

to admit evidence of a prior drug transaction as bearing on intent to possess), cert. denied, 514

U.S. 1041 (1995); United States v. Brown, 16 F.3d 423, 431 (D.C. Cir.) (evidence of the

defendant's possession of a gun at the time of arrest was relevant to show his intent, knowledge

or absence of mistake with respect to the firearms found in a safe during a search three months

earlier), cert. denied, 513 U.S. 900 (1994); United States v. Williams, 895 F.2d 1202, 1205-06

(8th Cir. 1990), cert. denied 520 U.S. 1150 (1997) (evidence that defendant was found with guns

and drugs in 1986 and 1987 was relevant to show that it was no mistake or accident that

defendant had guns and drug paraphernalia in his apartment during execution of search warrant

in 1988, and to show knowledge).

  Additionally, defendants' history as sellers of illicit drugs is relevant to show their

relationship.  United States v. Gaviria, 116 F.3d 1498, 1532-33 (D.C. Cir. 1997) (other crimes

evidence properly admitted where "'it shows or tends to show the existence of a relationship

between the defendants, and whether it shows or tends to show the defendants had a common

scheme or plan which included the offenses for which they are now charged.'"); United States v.

Graham, 83 F.3d 1466, 1473 (D.C. Cir. 1996), cert. denied 522 U.S. 1082 (1998) (evidence of

the criminal activity preceding the charged conspiracy helped explain the subsequent formation

of the larger conspiracy); United States v. Edmonds, 69 F.3d 1172, 1175 (D.C. Cir. 1995), cert.

denied 522 U.S. 902 (1997) (evidence of prior narcotics activities of conspirators admitted

pursuant to Fed. R. Evid. 404(b) to show roles in conspiracy); United States v. Clark, 24 F.3d

257, 265 (D.C. 1994) (evidence of prior narcotics activities of conspirators admitted pursuant to Fed. R. Evid. 404(b) to show intent to join charged conspiracy); United States v. Haynes, 881 F.2d 586, 589-590 (8th Cir. 1981), cert. denied 506 U.S. 898(1992) (not error to admit prior ten year period of maintaining marijuana house in same area where defendant later charged with maintaining crack house though charges included continuing criminal enterprise and conspiracy and prior bad acts occurred outside the time period in the charged case). Professor Imwinkelried, a leading commentator on Fed. R. Evid. 404(b) and "other crimes" evidence issues, has explained:

> Numerous cases allow the prosecutor to do precisely that [offer evidence of the defendants' prior illegal dealing to prove the act of entering into the conspiracy] (footnote citing cases omitted). In principle, this is a legitimate use of uncharged misconduct evidence. The prosecutor is not merely offering evidence of the defendant's prior misconduct with third parties and arguing that since the defendant once entered into an illegal transaction, he or she probably entered into the charged illegal agreement. Rather, the prosecutor is offering evidence of the defendant's special relationship with the same coconspirator involved in the charged conspiracy and contending that the earlier, special relationship increases the likelihood that they entered into the later, charged conspiracy. This theory of logical relevance is tenable. It is unlikely that a criminal would approach a complete stranger with a proposal for an unlawful conspiracy. It is much more plausible that the defendant will approach someone the defendant trusts (footnote omitted) and someone whom the defendant knows is willing to engage in illegal activity (footnote omitted). This is a permissible noncharacter theory of logical relevance.

Imwinkelried, *Uncharged Misconduct Evidence*, § 4.22 and n.2 (1984 ed. and 1988 supp.).

Also, evidence of the prior drug trafficking of cocaine, and in the case of Bryant heroin, would corroborate the testimony of the various cooperators in this case. See, Bowie, 232 F.3d at

932; United States v. Bailey, 319 F.3d 514, 520 (D.C. Cir. 2003).[12]

B.    Hopkins' Previous Use of his Father's Home to Sell Illegal Drugs and His Prior Sales of
      Cocaine Shows Intent and More and Should Be Admissible in the Government's Case-in-
      Chief

       Likewise, Hopkins' repeated use of his father's home is relevant to put the coded

calls into context, and to explain the items located in his father's home at the time of the search.

Further, it will show Hopkins' dominion over these items in his home and will eliminate any

juror concern that these items may belong to others.  Finally, his prior arrests and convictions,

and drug sales show of his intent, lack of mistake, and his identity.  See, United States v. Olivo,

80 F.3d 1466, (10th Cir. 1996) (defendant's other use of employer's truck to transport marijuana,

though not exact same manner of packaging, was admissible to show intent, knowledge, and lack

of accident or mistake in charged case wherein same truck used); United States v. Ramirez-

Jimenez, 967 F.2d 1321, 1325-26 (9th Cir. 1992) (Prior use of same truck to smuggle illegal

aliens admissible to show knowledge and intent in new smuggling case).

       Whether intrinsic or extrinsic to the charges in the Indictment, Hopkins' prior cocaine

selling activities are certainly evidence of Hopkins' intent and should therefore be admissible in

the government's case in chief.  Further, Bryants and Hargrove's prior drug selling activities

---

[12]     The government recognizes that the prior drug selling activities of Bryant are old,
but they nonetheless show his familiarity with the drug trade.
       Hargrove's attendance at prior meeting to discuss and impending drug deal is obviously a
different matter.  However, Hargrove was trusted to be present during a discussion of a drug sale
which took place in the intimate confines of an automobile.  The government's counsel believes
that it does not serve  the government's interest to ambush this Court with such facts, should
something happen that might trigger the admissibility of such facts.
       Further, even though Hargrove moved homes between the time when he witnessed the
meeting about the drug sale and the time when he participated in the instant conspiracy, he still
had small bags in his home like the type used to sell cocaine, further indicating his familiarity
with drug sales.

should be admitted to show intent.  (Michael) Johnson, 40 F.3d at 441 (prior drug transaction

properly admitted to show intent to possess); United States v. Burch, 156 F.3d 1315, 1324 (D.C.

Cir. 1998) (evidence of defendant's prior conviction for attempted possession with intent to

distribute admissible to prove knowledge and intent), cert. denied, 526 U.S. 1011 (1999); United

States v. Washington, 969 F.2d 1073, 1081 (D.C. Cir. 1992) (evidence of prior drug transaction

properly admitted to show intent, knowledge and plan by defendant).

Finally, Troy Hopkins' later drug selling activities should also be admissible to show his

intent, particularly here, where he resumed selling PCP, which he bought from cookers in Los

Angeles.  Subsequent extrinsic acts are admissible to prove his intent where they are similar to

the charged crime.  United States v. Ayers, 924 F.2d 1468, 1472-73 (9th Cir. 1991).

C.    Evidence of Flight by Hopkins and Tinesha Adams is Relevant to Show Their State of
      Mind and Should be Admissible in the Government's Case-in-Chief.

The evidence of Hopkins' and Adams' protracted flight from apprehension and

prosecution should be admitted to show their respective states of mind.  Evidence of flight of the

accused is admissible as evidence of his consciousness of guilt.  United States v. Edmonds, 240

F.3d 55, 62 (D.C. Cir. 2001).  Flight from the authorities has been viewed as "competent

evidence against [the accused] as having a tendency to establish his guilt."  Allen v. United

States, 164 U.S. 492, 499 (1896).  "Traditionally, flight has been viewed as an admission by

conduct which expresses consciousness of guilt."  United States v. Martinez, 681 F.2d 1248,

1256 (1982), cert. denied 456 U.S. 1008 (1982).  Flight evidence, therefore, "carries with it a

strong presumption of admissibility.  Id. (citations omitted).

As a matter of common sense, the flight by Hopkins and Adams are clearly probative of

their guilty state of mind.  This is particularly true since both conspirators knew that they were

wanted and/or under investigation.  Hopkins spoke directly to Special Agent Jesus Gomez who

told him that he was wanted.  Adams told a co-conspirator that she did not want to turn herself

into authorities until she was assured of a lower possible sentence.   Her own statement reveals

that she was afraid of and anticipated apprehension.  Such flight certainly demonstrates a guilty

state of mind on the part of both Hopkins and Adams.

In a similar series of facts, in United States v. Solomon, 688 F.2d 1171, 1176 (7th Cir.

1982), the Seventh Circuit found that a defendant's flight after meeting with an IRS agent, and

his subsequent attempt to obtain a new, false identity, were surely evidence of his guilt.  Accord,

United States v. Hampton, 457 F.2d 299 (7th Cir.), cert. denied, 409 U.S. 856 (1972); United

States v. Jackson, 572 F.2d 636 (7th Cir. 1978); and, United States v. Myers, 550 F.2d 1036, 1049

(5th Cir. 1977).

While the District of Columbia Circuit does not appear to have issued any opinion about

how a jury should be allowed to consider long-term flight from prosecution such as that of

Hopkins and Adams, a number of other jurisdictions have found such behavior relevant.  These

courts have held that a protracted but fruitless search for a fugitive who is aware that he is

wanted by the police is probative evidence of flight and consciousness of guilt.  See United

States v. Porter, 821 F.2d 968, 975-976 (4th Cir. 1987) (proper to admit evidence that appellant

was told there was a warrant for his arrest yet failed to turn himself in; such evidence provides an

adequate factual basis for a flight instruction), cert. denied, 485 U.S. 934 (1988); United States v.

Eggleston, 799 F.2d 378, 381 (8th Cir. 1986) (proper to admit evidence that appellant contacted

deputy sheriff who informed him that the F.B.I. was looking for him); United States v.

Grandmont, 680 F.2d 867, 869 (1ˢᵗ Cir. 1982) (proper to admit evidence that F.B.I. agent was unable to locate appellant at his home or the places he was known to frequent); State v. Freeney, 637 A.2d 1088, 1093 (Conn. 1994) (flight may be proven by efforts by the police to locate the defendant, by evidence that the defendant knew he was wanted, and by evidence that the *defendant's family knew he was wanted*)(emphasis added); Stanley v. State, 560 So.2d 1269, 1269-70 (Fla. Dist. Ct. App. 1990), cert. denied 246 Conn. 963 (1999) (evidence that detectives repeatedly but unsuccessfully searched for the defendant and that defendant informed an officer he would surrender merited flight instruction).

While the D.C. Circuit cases dealing with flight as evidence of consciousness of guilt appear to be mostly in the area of instructional error, these cases often contradict the logic of Fourth Amendment cases that deal with police perception of flight in their discussion of the value of flight evidence and its significance. See Austin v. United States, 414 F.2d 1155, 1156-7 (D.C. Cir. 1969). In Austin, the defendant had robbed the complainant at her place of work one day earlier. Id. at 1156. When the complainant spotted the defendant at a gas station the following day, she pointed him out to a police officer. Id. The police officer followed the defendant as the defendant walked away at a "rapid pace." Id. The defendant later testified that he did not even see the officer. Id. The Circuit commented that, although innocent people do sometimes flee from the police, a flight instruction was properly given on the facts in Austin. Obviously the facts of this instant case and Hopkins' and Adams' long-term fugitiveness are quite different from the facts in Austin. The value of the dicta and asides in Austin are very limited as they apply to the instant case.

The comments by the Court in <u>Austin</u> contradict the logic of the many cases that allow a police officer to consider flight in determining whether he has a reasonable suspicion to detain a suspect, or to make an arrest.  <u>Illinois v. Wardlow,</u> 528 U.S. 119, 123-4 (2000), <u>California v. Hodari D.,</u> 499 U.S. 621, 623 n.1 (1991);  <u>Edmonds,</u> 240 F.3d at 62.  As noted in <u>Edmonds,</u> the District of Columbia Court of Appeals has held that "'one person's flight is imputable to another only if other circumstances indicate that the flight from authority implies another's consciousness of guilt.'"  <u>Id</u>., <u>quoting</u> <u>United States v. Johnson</u>, 496 A.2d 592 (D.C. 1985).  No case in the D.C. Circuit addresses a factual scenario like the one presented in this case.  What is important in all of these flight cases is that the accused was aware of law enforcement's pursuit of him and that he was fleeing in response thereto.  <u>Id</u>.

In this case the facts amply support the conclusion that both defendants knew they were wanted and fled for that reason.  As such their flight is relevant to their states of mind.

## IV. <u>CONCLUSION</u>

For all of the reasons stated above, the evidence noticed herein is relevant to the charged conspiracy and, in most instances, it is intrinsic to the charges.  It should all be admitted in the government's case in chief.  At the time of the hearing on this, and in any subsequent filing, the government may note additional grounds for the admission of the above-described evidence.  Should the government learn of any additional evidence, it will promptly notify this Court and counsel in writing.

WHEREFORE the government gives notice of its intent to use intrinsic and extrinsic evidence in its case in chief and requests this Court allow its admission.

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY
DISTRICT OF COLUMBIA

By:_____
    S. ELISA POTEAT
    Bar No.: 420-604
    Phone: (202) 514-7067
    EMORY V. COLE
    Assistant U.S. Attorneys
    555 4th Street, N.W.
    Washington, D.C. 20530

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Notice has been mailed on this, the 25th day of July, 2007, to the following attorneys:

_____
S. ELISA POTEAT
ASSISTANT U. S. ATTORNEY


Defense Counsel:

1)    Mr. Howard Bernard Katzoff, Esq.
      Counsel for Defendant Lawrence Bryant
      katzoffh@aol.com

2)    Mr. James W. Rudasill, Jr., Esq.
      Counsel for Defendant John Downs
      rudasilljr7@aol.com

3)    Mr. Nathan Silver, Esq.
      Counsel for Defendant Darnell Jackson
      nisquire@aol.com

4)    Mr. Rudy Acree, Esq.
      Counsel for Defendant Bernie Hargrove
      Faxed to 202-331-7004

5)    Mr. Jensen Barber, Esq.
      Counsel for Defendant Keith Roots
      jebarber@aol.com

6)    Mr. Gary Sidell, Esq.
      Counsel for Defendant Lanika Mercedes Franklin
      suitcase@verizon.com

7)    Mr. Harry Tun
      Counsel for Defendant Troy Chavious
      Tunharry@aol.com

8)    Mr. Steven J. McCool
      Attorney for Defendant Damon Dixon

-46-

smccool@mallonandmccool.com

9)    Mr. Cary Clennon
      Attorney for Defendant Troy Hopkins
      Clennon_law@comcast.net

10)   Mr. Eduardo Balarezo
      lawoffice@balarezo.net